IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>FORTY-SEVEN (47) PIT BULL-TYPE DOGS,<br><br>    Defendants. | Civil No. |

**COMPLAINT FOR FORFEITURE IN REM**

Plaintiff, United States of America, by its attorneys, Jeffrey P. Ray, Acting United States Attorney for the Western District of Missouri, and Leigh Farmakidis, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

**NATURE OF THE ACTION**

1.  The United States of America (the "United States") has commenced this civil action, in rem, to enforce the provisions of 7 U.S.C. § 2156(e) seeking the forfeiture of forty-seven (47) Pit-Bull type dogs (the "Defendant Property") that were involved in a violation of the animal fighting venture prohibition of the Animal Welfare Act, 7 U.S.C. § 2156.

## THE DEFENDANT IN REM

2. The Defendant Property was seized from Vinol Wilson. The Defendant Property was seized on or about May 20, 2025,[1] by the United States Department of Agriculture - Office of Inspector General ("USDA-OIG") in the Western District of Missouri.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 21 U.S.C. § 881(j), because the owner of the property is found in this district.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395, because the owner of the property is found in this district.

## BASIS FOR FORFEITURE

6. The Animal Welfare Act, 7 U.S.C. § 2156(f)(1), defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." It is a violation of 7 U.S.C. § 2156 to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture."

---

[1] There are currently 47 dogs that came from this seizure. There were fifteen adult dogs and one 4-week-old puppy that were seized on May 20, 2025. Shortly after seizure, USM-001 went into labor and had 9 puppies (2 stillborn) at the ER. Once at the contractor facility, dog USM-002 had 8 puppies on June 11, 2025, dog USM-003 had 7 puppies on June 20, 2025, and USM-005 had 7 puppies on June 28, 2025.

7. The Animal Welfare Act provides that "[a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct." *Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found or transacts business." *Id*

8. As explained below, the Defendants are animals involved in a violation of 7 U.S.C. § 2156, and are, therefore, subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156(e).

## BACKGROUND

9. Dog fighting is a violent contest in which two dogs that are bred and conditioned for fighting are released by their owners or handlers in a controlled environment to attack each other and fight for purposes of entertainment or gambling. Fights usually end when one dog withdraws, when a handler "picks up" his dog and forfeits the match, or when one or both dogs die.

10. Terrier mix or pit-bull type dogs are the most prevalent type of dogs used in dog fighting ventures. This is due to their short coat, compact muscular build, and the aggressive temperament that some exhibit toward other dogs.

11. Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight those dogs that display particular traits. It is a common practice for individuals

involved in the breeding, raising, conditioning, and exhibition of fighting dogs to possess multiple dogs of both sexes and of a variety of ages.

12. This practice is followed for several reasons. First, dog fighters maintain a stock of dogs at different weights and both sexes because, in dogfights, dogs are matched against other dogs by an agreed upon weight and by the same sex.

13. Maintaining a stock of several dogs, therefore, increases the odds of owning a dog of the required sex that can be readily conditioned to the agreed upon weight for a contracted match.

14. Additionally, dog fighters maintain multiple dogs to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dogfighting "bloodline."

15. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury.

16. Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively.

17. Dog fighters can generate substantial income from gambling on dog fights and from the sale and breeding of animals with a fighting lineage.

18. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up.

19. The dog then undergoes a conditioning process dog handlers refer to as a "keep."

4

20. A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine.

21. Dog fighters typically do not start setting up matches for a dog until the dog reaches at least 18 months of age. Until then, dog fighters may test the dog out by "rolling" it or having the dog participate in short fights to assess the dog's demeanor. Thus, it is common for dog fighters to possess young dogs that are in the process of being trained to fight and, consequently, do not yet have much, if any, scarring.

22. Because of their conditioning and training, dogs used in animal fighting ventures are almost always housed separately from other dogs—in pens, cages, or on chains—so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs outdoors to develop neck strength in dogs used for fighting purposes.

23. It is common for dog fighters to possess dog fighting paraphernalia used to exercise, train, restrain, and strengthen or condition their dogs, including:

   a. Treadmills, including treadmills that are modified to keep a dog from getting off the treadmill;

   b. Weighted collars, chains, and weight scales;

   c. "Spring poles"—ropes that dangle animal hides or "lures" that, when gripped by a dog's mouth, result in the dog being suspended partly or entirely off the

ground. Spring poles are commonly used by dog fighters to strengthen and condition a dog's jaw and neck muscles to achieve a better "bite";

 d. "Flirt poles"—long poles with a hide or fur lure attached that is moved by a trainer to tease a dog; and

 e. "Break sticks"—sticks of wood, plastic, fiberglass, resin, or other material that are used to pry open the jaws of dogs during a dog fight.

24. Dog fighters often attempt to mend the injuries of their dogs rather than seek veterinary attention, which would raise suspicion regarding the cause of injuries. Thus, it is common to find veterinary supplies, including animal medication or supplements (which do not require a prescription), where dogs involved in dog fighting are being kept.

25. Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dog fights are commonly found on the face, neck, and front legs.

## FACTUAL ALLEGATIONS

26. As part of an ongoing investigation, USDA-OIG identified a multi-state dog fighting ring of dog fighters.

27. On May 20, 2025, investigators discovered evidence, instrumentalities, and fruits of violations of 7 U.S.C. § 2156 at Wilson's residence.

28. Pit bull-type fighting type dogs were located in numerous locations throughout the residence. Three pit-bull fighting type dogs were located in the basement in kennels. These animals had visible injuries and scars consistent with fighting animals.

29. Six puppies and 2 female pit bull-type dogs were located in a shed in the back yard. Three additional pit-bull type dogs were located in kennels in the backyard. One of the pit-bull type dogs was chained to the ground and has visible injuries and scarring.

30. All of the adult dogs were kept isolated from one another in crates or kennels, other than the puppies, which were kept in crates together.

31. Numerous medications and veterinary medicines were discovered in the basement and garage including Ivermax, Red-Cell, Aminoplex, Animal Pak, and Albon in addition to many others. Additional animal medications were found in the garage.

32. Indications of a fighting type pit were identified in the garage.

33. Multiple areas of the residence including the garage, the basement, a wash tub in the basement, and a door that appeared to have been used as a pit wall tested positive for blood. A roll of carpet in Wilson's vehicle tested positive for blood.

34. A flirt pole was found in the garage and a "slat mill"-type treadmill was found in the basement, in addition to another traditional style treadmill.

35. Multiple break sticks were found in the residence.

36. Numerous documents related to dog fighting were found in the residence, including various folders of pedigree information from apbt.online-pedigrees.com, a known dogfighting pedigree website; copies of known underground private dogfighting magazines; ledgers containing the names and addresses of other known dogfighters identified in the investigation; a binder "how-to" guide for training a fighting dog.

37. Two plaques from the "K.C. Smack Down 2024" bearing the names "G.I.S." and "Best in Show" were found in the residence. Upon information and belief, "G.I.S" stands for

"Gamest in Show" and is commonly given out to the dog who displays the most heart or "game" during an event.

38. Investigators observed Wilson wearing a shirt with a pit bull-type dog on the front which read "Show-Me State 2". The back of Wilson's shirt was later observed and contained apparent kennel names and "Gameface (Host)" at the top of the shirt. Upon information and belief, "Gameface" is one of Wilson's aliases and "Show Me" event is an event hosted by Wilson in previous years.

39. On May 20, 2025, law enforcement seized fifteen adult dogs and one 4-week-old puppy on May 20, 2025. Shortly after seizure, USM-001 went into labor and had 9 puppies (2 stillborn). Once at the contractor facility, dog USM-002 had 8 puppies on June 11, 2025, dog USM-003 had 7 puppies on June 20, 2025, and USM-005 had 7 puppies on June 28, 2025.

40. Law enforcement subsequently interviewed an individual who admitted being at an event at Wilson's house on May 17, 2025. The individual was stopped in his vehicle on the morning of May 18, 2025. In the vehicle, he had dog-fighting paraphernalia and a wounded dog that, according to the individual, had competed in the event.

## CLAIM FOR RELIEF

41. The Plaintiff repeats and incorporates by reference the paragraphs above.

42. By the foregoing and other acts, the Defendant Property is subject to forfeiture under 7 U.S.C. § 2156(f).

WHEREFORE the United States prays that the defendant property be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just. The United States further requests costs

incurred in caring for animals seized and forfeited in this action from the owner of the animals, pursuant to 7 U.S.C. § 2156(e).

          Respectfully submitted,

          Jeffrey P. Ray
          Acting United States Attorney

By:    */s/ Leigh Farmakidis*
       Leigh Farmakidis
       Chief, Monetary Penalties Unit
       Assistant United States Attorney
       400 E. 9th Street, Fifth Floor
       Kansas City, Missouri 64106
       Telephone: (816) 426-3122
       Leigh.Farmakidis@usdoj.gov

## VERIFICATION

I, Special Agent Caleb Landess, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Department of Agriculture, Office of Inspector General. I have read the foregoing Verified Complaint in Rem and know the contents thereof, and the factual matters contained in paragraphs 9 through 40 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Department of Agriculture.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated 7/16/25

Special Agent Caleb Landess
U.S. Department of Agriculture
Office of Inspector General